**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **J.B. B/N/F KIMBERLY BEASON** | § | |
| **AND SCOTT BEASON,** *individually* | § | |
| *Plaintiffs* | § | |
| v. | § | **CIVIL ACTION NO.   4:19-cv-210** |
| | § | |
| **KLEIN INDEPENDENT** | § | |
| **SCHOOL DISTRICT,** | § | |
| *Defendant* | § | |

**FIRST ORIGINAL COMPLAINT**

J.B. ("J.B." or "Student") by and through her next friend and legal guardians Kimberly

Beason and Scott Beason (collectively "Plaintiffs" herein) files this *First Original Complaint*

alleging that the Klein Independent School District (hereinafter referred to as "KISD" or the

"School District") violated the various rights of the Student, as more specifically pled herein.

Plaintiffs reserve the right to re-plead if new claims and issues arise upon further development of

the facts, as permitted by law. In support thereof, Plaintiffs would respectfully show this tribunal

the following:

**I.   BRIEF INTRODUCTION TO THE CASE**

1.      J.B. was born on May 29, 2003; she is now 15 years old.

2.      The #METOO Movement is predicated upon several facts that are absolutely

uncontroverted: first, that men who have teased, bullied, harassed, assaulted, and even

sexually assaulted females got away with it, because females were either too scared to

complain or when they did, nothing was done about it.

3.      The second fact, that most assuredly flows from the first, is that the males who took

advantage of females continued their mistreatment of women because no one stopped them from doing so.

4.   A third fact is that initial workplace banter and teasing toward women, left unabated, increases in severity and intensity. In fact, that is exactly what happened in this case, except it started in elementary school when a group of young male students teased, bullied, sexually harassed, and even assaulted J.B. over the course of almost six years.

5.   Even though J.B.'s mother complained to KISD administrator after administrator, principal after principal, counselor after counselor, teacher after teacher, no one ever investigated the allegations whether pursuant to Title IX jurisprudence or KISD's own policies and procedures.

6.   Not surprisingly the daily harassment to J.B. at KISD over many years took its toll on her, so much so that J.B. developed severe anxiety, depression, insomnia, and physical manifestations of each of these. Ultimately, she was forced out of her school at KISD

7.   There is not a week that goes by where there is not some media story about the plight of a young person who is bullied, harassed, assaulted, or even sexually assaulted at their school. Frankly, it is a national epidemic. Unlike the task of containing the spread of a flu virus by means of vaccines and treatment, this type of epidemic is particularly difficult to treat because often the school district itself, as in J.B.'s situation, is part of the illness and refuses to recognize its own responsibility. KISD's failure is troublesome because they were on notice as to the horrible bullying and harassment J.B. experienced and did nothing about it.

8.   For the families there is nothing worse than seeing their own child suffer. To give

meaning to their child's experience, they feel compelled to tell their story. They feel a duty to do so in the hope the presentation of their story will prevent the same from happening to another family. In the course of this telling, these victims benefit from a healing effect. The healing and empowering effect is even more pronounced when the story is told before a neutral tribunal, as Plaintiffs have chosen to do in her case, so that the bright light and sanitizing effect of federal law and the tribunal's gaze is focused on this important issue and the School District's failures.

## II.  JURISDICTION

9.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the laws of the United States.

10.     J.B. is a citizen of the State of Texas, and was at all pertinent times a student in the Klein Independent School District.

11.     During the relevant time-period in this cause, and upon which this complaint is based, J.B. was a student attending Hildebrandt Intermediary in Klein Independent School District.

12.     Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Southern District of Texas, Houston Division

## III.  PARTIES

13.     J.B. lives with her mother--Kimberly Beason, her father—Scott Beason, and her brother at 25010 Pikecrest; Spring, Texas 77389. They live within the Klein Independent School District catchment area.

14.     Klein Independent School District is a school district organized under the laws of the State of Texas. At all times pertinent to this case, J.B. was a student at the Klein Independent School District. They may be served by and through their Superintendent, Dr. Bret A. Champion 7200 Spring Cypress Road; Klein, Texas 77379. The Defendant's attorney, the Honorable Clay Grover with the law firm of Rogers, Morris & Grover, L.L.P., 5718 Westheimer Road, #1200, Houston, Texas 77057, has agreed to answer and accept service.

## IV.    HISTORICAL BACKGROUND OF TITLE IX

15.     The Educational Acts of 1972 passed through Congress as Public Law No. 92-318, 86 Stat. 235 (June 23, 1972) and codified at 20 U.S.C. sections 1681 through 1688. It is commonly known as "Title IX" and states (in part) that:

> *No person in the United States shall, on the basis of gender, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.*

16.     It is intended to remedy the effects of discrimination based upon sex, gender or gender stereotypes. Moreover, it is to assure that a student is not a victim of bullying, harassment, sexual harassment, assault or sexual assault because of their membership in this protected class.

**A.     The Operative Law & Regulations**

17.     The Department of Education promulgated rules to help implement Congress' intent at 34 C.F.R. §106.1, which became effective as early as July 1, 1975. From the inception of Title IX, the United States Department of Education ("DOE") in their *Office for Civil Rights* (OCR) issued policy guidance on discriminatory harassment. They did so on

discrimination based upon race (see 59 Fed. Reg. 11448 (Mar. 10, 1994) and later regarding harassment based upon sex ["Title IX"] (see 62 Fed. Reg. 12034 [Mar. 13, 1997]). These rules made clear that school personnel must understand their legal obligations to address harassment based upon sex, gender and gender stereotypes and further, that they were in the best position to recognize and prevent the harassment, to lessen the harm to students if, despite their best efforts, harassment continued to occur and importantly, remedy the effects of the harassment.

**B.      Gebser v. Lago Vista Independent School District**

18.     In 1998 the United States Supreme Court addressed the applicability and scope of civil liability against a school district, when one of the teachers was involved in a sexual relationship with a student. Gebser v. Lago Vista Independent School District, 524 U.S 274, 286 (1998).

19.     The teacher and the student had intercourse during class time, although never on school property. The student did not report the relationship to school officials. After a police officer discovered the student and the teacher engaged in sexual intercourse, the teacher was arrested and terminated from employment.

20.     The student filed suit for sexual harassment under state law, Title IX, and §1983. The trial court dismissed the federal claims and remanded to state court for the state law negligence claims. The intermediate appellate court affirmed dismissal of the federal claims. The student sought review in the U.S. Supreme Court and found that a student is not allowed to recover for sexual harassment by one of the district's teachers unless an official of the district had actual notice of and was deliberately indifferent to the

misconduct.

21. Among other things the Student focused primarily on Lago Vista's failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims. They pointed to Department of Education regulations requiring each funding recipient to "adopt and publish grievance procedures providing for prompt and equitable resolution" of discrimination complaints, 34 CFR § 106.8(b) (1997), and to notify students and others "that it does not discriminate on the basis of sex in the educational programs or activities which it operates," §106.9(a).

22. The District argued that Lago Vista's alleged failure to comply with the regulations, however, does not establish the requisite actual notice and deliberate indifference to specific instances of sexual harassment. The Court agreed and wrote found that "in any event, the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX." Further, that the Department of Education could enforce administrative requirements but that the Court noted that there could never be a private right of action under Title IX and allow recovery in damages for violation of *those sorts* (emphasis added) of administrative requirements. What sort or sorts of administrative requirements that could or might rise to the level of liability, was soon addressed in a case alleging student upon student sexual harassment and assault, where School District Officials were on notice of the sexual harassment of a female student and were deliberately indifferent to it.

**C.    Davis v. Monroe County Board of Education I and II**

23. The controlling case on the subject of student upon student sexual harassment is <u>Davis v.</u>

Monroe County Board Of Education, 526 U.S. 629 (1999). Beginning in and about December 17, 1992, and continuing through May 19, 1993, LaShonda Davis, a student at the Monroe County Board of Education in Georgia began to be harassed by a fellow fifth-grade student, during school hours. She filed a lawsuit against the School District alleging she was a victim of discrimination based upon both constitutional law and statute. Her claims were dismissed at 862 F. Supp. 363 (M.D. Ga. 1994) and she appealed. In 1997 the 11th Circuit affirmed the District's Court's decision in the Davis v. Monroe County Board of Education at 120 F.3d 1390 (11th Cir. 1997). She appealed again.   On January 12, 1999, the Supreme Court heard oral argument in Davis v. Monroe County Board Of Education.

**D.      The United States Department of Education, Office of Civil Rights**

24.     During this same period leading up to and through both Gebser and Davis, the United States Department of Education, Office Of Civil Rights ("OCR"), promulgated a number of directives for school district's to follow regarding harassment, bullying, sexual harassment and even sexual assault. Many were predicated on the regulations promulgated by the Department of Education, including those related to the procedural rights and protections a student and their parents had pursuant to Title IX.

25.     Also, in January of 1999, the OCR produced *Protecting Students From Harassment And Hate Crime*. It essentially provided a *Checklist* for a school district to follow, with the intent it would help the district develop a culture making schools safer for all students and help to *prevent* harassment and sexual assault and importantly, to *remedy* its effects. In a document of over 157 pages it noted that sexual harassment if ignored, could

jeopardize a student's academic achievement, undermine their physical and emotional well-being and often provoke retaliation.

26.    It listed a number of examples of effective actions including, most importantly; timely investigations, appropriate use of punishment, remedial actions like increasing adult supervision of "hot spots," close monitoring of the victim or perpetrator, use of informal conflict resolution, providing emotional and psychological support for the victim and perpetrator, and greater teaching across the school community including and especially staff. It stressed the need for a compliance coordinator to assure that the school district followed the various directives developed by the OCR and that any such intervention provided be assessed on an ongoing basis for effectiveness.

**E.    Davis v. Monroe County Board of Education, Supreme Court Decision**

27.    The Supreme Court announced its opinion on May 24, 1999, just months later. The Court reviewed the underlying facts and noted that LaShonda Davis was harassed by a male student (G.F.) from approximately December of 1992 to the middle of May in 1993, for just about six (6) months. During this period the boy attempted to touch her breasts and genital area. He also made vulgar statements occurring twice in January of 1993. These three incidents were reported to the classroom teacher, who told LaShonda's mother and that the school's vice-principal, was made aware of the incident and would take action. The record reflects none was taken. There are specific allegations of two other incidents in February, one in gym class and another in the classroom. Both were reported. Here again, the record reflects that no action was taken. There was another allegation in early March and again no action was taken. Apparently G.F. also bothered other females and as

a group, the girls attempted to speak with the school's principal about the situation, but he refused to do so. Importantly, the Supreme Court noted that no effort was ever made to separate G.F. and LaShonda, even when she just wanted to change seats in class. During this period LaShonda's grades fell and she became depressed and suicidal.

28. The Supreme Court first addressed the School Board's argument that Title IX did not extend to student upon student sexual harassment, because there was nothing in the enabling legislation that would have put them on notice, of such liability. They summarily rejected that contention and noted that the regulatory scheme promulgated by the Department of Education had long provided School Boards notice that they could be liable for failure to adequately respond to known student upon student harassment. 119. S.Ct. 1671 *citing* 34 C.F.R. §106.31(b)(6) [aiding or perpetuating discrimination]; 106.31(d) [shall develop, design and implement procedure to stop the harassment]; 106.37(a)(2) [shall not approve or assist in discrimination]; 106.38; 106.51(a)(3)[1998].

29. The Supreme Court also noted that School Board's across the country were also on notice that they could be held liable for their own failure to address harassment and follow the guidelines developed by the Department of Education's *Office of Civil Rights* ("OCR"). 119. S.Ct. 1673 citing 62 Fed. Reg. 12034, 12039-12040 [1997]; 59 Fed. Reg. 11448-11449 [1994] if it were due to their own deliberate indifference to follow such guidelines, when a district official was on notice of potential sexual harassment of a student, by another student or even a teacher.

30. They also noted that as early as in 1993 the National School Board Association had issued a publication, for use by "school attorneys and administrators in understanding the

law regarding sexual harassment of employees and students," which observed that districts could be liable under Title IX for their failure to respond to sexual harassment of a student by another.

31.     This case set forth the elements a student would have to satisfy to hold a school district liable, for violations of their rights pursuant to Title IX. First, that the student must be member of a protected class and be bullied, harassed or assaulted because of their membership in that class (based upon sex or gender); second, that the harassment be severe and pervasive such that the student experience a deprivation of educational opportunity; third, that the school district was on notice of the harassment and last, that they were *deliberately indifferent* to it. Importantly, the Court affirmed that a public school district has a threshold duty not only to investigate the allegations in a timely manner, but a parallel duty to assure the student does not become more and more vulnerable to the harassment. Moreover, the District has a duty to not only prevent ongoing and future occurrences of the harassment but to remedy the effects of past harassment.

**F.      More From The United States Department of Education, *Office of Civil Rights***

32.     In any case, after the Gebser and Monroe decisions, the OCR sent out a *Memorandum or Dear Colleague Letter* in 2000 to public school districts across the country noting they could be held liable for civil damages when a student is bullied or harassed based upon sex or gender, as previously noted in the regulations promulgated at 62 Fed. Reg. 12034 (Mar. 13, 1997) and they were deliberately indifferent to such harassment. It discussed, among other things the profound effects of harassment on a student, the laws and rules

*First Original Complaint*                                                                                        10

that apply and how such harassment, unrequited, effects a student's equal opportunity under those laws to receive an education. It reiterated all the various interventions needed to satisfy federal law, rules and OCR directives. It reinforced the duty to provide counseling to both the victim and even the perpetrator and to have a program to assess the effectiveness of interventions and monitor unresolved issues.

33.     In January of 2001 the OCR issued a "Revised Sexual Harassment Guidance," giving notice to school districts that discrimination based upon gender, including and especially that such harassment is actionable reiterating the standards of care enunciated in <u>Gebser</u> and <u>Davis</u>. Over time the OCR issued various executive directive on issues of bullying, harassment and discrimination based upon gender. Its intent was to respond to <u>Davis</u> and among other things, reinforced the need to let students and their parents know about their procedural rights in such an instance, including but not limited to the School District's grievance procedures.

34.     It provided school boards further direction on its specific obligations and reiterated that in completing an investigation the District should review the effect of the sexual harassment on the child's education; the type, frequency and duration of the conduct, the number of individuals involved, the location of incidents and the "totality of the circumstances." Importantly, the School District is required to provide prompt and effective action, let a family know of the harassment the child was experiencing in a timely manner and provide information about their procedural rights under the regulations including and especially a grievance process. Most importantly, it noted the need for any investigation to be impartial. Last, if a student has been a victim of sexual harassment the school

*First Original Complaint*                                                                                                                  11

district has a number of potential interventions including the provision of or paying for counseling, working with a tutor and giving the student the opportunity to make up work. Moreover, an essential part of a school district's duty is to provide ongoing assessment and follow up inquiries, as to the effectiveness or ineffectiveness, of any remedy actually or attempted to be provided.

35.     In January of 2006, the OCR sent out another Memorandum or Dear Colleague Letter regarding harassment based upon sex or gender. The letter enclosed the January 2001 "Revised Sexual Harassment Guidance" booklet. Since that time the OCR has sent out a number of guidelines and directives, almost every year since, essentially reiterating a school district's duties when they receive notice that a student alleges they have been a victim of bullying, harassment or assault based upon sex or gender. They too have been incorporated into the jurisprudence as to Title IX and Texas law.

**G.     Texas Law**

36.     It is a long-standing and well settled law, that educators have a duty to report abuse and neglect of a minor. *See* Texas Family Code §261.101; *see* Texas Education Code §21.006; 19 T.A.C. §61.1051. Abuse includes, but is not limited to, any type of sexual conduct that causes or could cause emotional injury to a minor. Id. at §261.001(1)(A, B, E, F).

37.     In addition, the Texas Education Agency ("TEA") and their various local service centers working under TEA's purview developed and disseminated a significant amount of support material for school boards as to how to best prevent bullying and harassment in general, and bullying and harassment based upon sex and gender in particular. This

included the develop of Ethical Standards for teachers as developed what is called the *State Board of Educator Certification* ("SBEC") Among many things, included language taken from the Texas Family Code.

38.     In 2003, the duties that all educators had to report abuse was reinforced for School Superintendents who had specific duties, in addition to those noted in the Family Code, to report such allegations to the school Board of Trustees, TEA and SBEC. Texas Education Code §21.006(c), (d). In fact, a School Superintendent who failed to take such reporting measures could liable civilly, criminally or have an ethical complaint filed with TEA and even lose their own license.

39.     In addition, the various federal guidelines and directives also noted above, over the course of time became integrated into, and became part of, Texas law as well. First, there were increased penalties in the Juvenile Justice system for students who assaulted, bullied and harassed other students.

40.     In addition, School Boards were provided significant information from the Texas Association Of School Boards ("TASB") on how to best respond to assaults, bullying and harassment, when it occurred. In fact, in September of 2008, TASB disseminated a memorandum entitled *Harassment And Bullying Policies In Public Schools*. It noted the requirement that schools must have an active policy and practice regarding both teacher upon student and "student-to-student harassment" sexual harassment. It noted, the most recent applicable legislative changes. Among other things it noted that a school district could be liable when there is teacher upon student sexual harassment and the district's "deliberately indifference cause students to undergo harassment or makes them

vulnerable to it, and the harassment takes place in a context subject to the school district's control," citing Gebser and Davis; and relevant Code of Federal Regulation Sections; *see* 34 C.F.R. §106.8 - 106.9, as to how to address allegations of sexual harassment.

41.   In regard to addressing issues of assault, bullying and harassment it referred school districts in Texas to look to the Office of Civil Rights, *Protecting Students From Harassment And Hate Crimes: A Guide For Schools* (as noted above). In addition, the TASB also helped the Klein ISD to develop a number of very specific policies, procedures and practices related to bullying, sexual harassment and sexual assault.

42.   In 2011, the Texas Legislature again addressed bullying, harassment and sexual harassment in the public schools by passing comprehensive and far-reaching legislation on the topic. Put into the Texas Education Code, staff was required to have specialized training on the topic (Section 21.451) and that students were to be provided various types of assistance including counseling.

43.   In response to all the above, in 2012 TASB again provided School District's in Texas guidance on addressing allegations of sexual harassment. It promulgated updated versions of policies and procedures that a school board like the Klein ISD could adopt to address sexual harassment by staff. The bulletin sent out to all Texas School Districts reiterated their duties to have a functional policy and procedure for reporting, investigating and issuing a determination regarding an allegation of sexual harassment. It also reiterated the duty to train not only staff but students on issues regarding sexual harassment. It further underscored and reiterated the duty for staff to report allegations of sexual misconduct between a teacher and student to child protective services. Texas

Family Code 261.101(b).

**H.     Policies & Procedures Developed By The Klein Independent School District**

44.     The Klein Independent School District has long had and re-authorized policies and procedures related to *Student Welfare* and keeping students free from Discrimination, Harassment & Retaliation, that address among other things, including teacher upon student sexual harassment and assault. It specifically *cites* a number of civil cases, chief among them the Gebser and Davis decisions noted above.

45.     It sets out definitions of sexual harassment, information about reporting allegations of bullying and harassment between staff and a student, and their own investigatory procedures. It required allegations of bullying and harassment based upon sex or gender to be directed to the School District's Title IX Coordinator, and the family be given that person's contact information. The family also was required to receive actual notice of their procedural rights. The school district's investigation needed to be completed in a timely manner, usually less than ten (10) days, that a written report should be developed and interim action taken, as appropriate. The report must address whether or not prohibited contact occurred and must be filed with the relevant School District Official. If a student is not satisfied with the outcome of the investigation, they have the right to appeal the decision through the District's grievance procedure or even with the Office of Civil Rights with the U.S. Department of Education.

46.     The School Board Policies also note a non-exhaustive list of potential corrective actions. They include for instance, a training program for the victim, a comprehensive education program for the school community and counseling to the victim. There also had to be a

*First Original Complaint*                                                                                                          15

system to follow up with the victim to assess the effectiveness of any intervention that may have been provided. There is also discussion of increasing staff monitoring and assessment of the problem.

47.     The Klein Independent School District policy and procedures which were developed to address bullying, harassment, assault or even sexual assault based upon sex or gender fully follow the requisites of federal and state law, federal rules and regulations, caselaw, OCR guidelines and professional standards of care, all as noted above.

48.     Nevertheless, Klein ISD has failed to adhere to all such duties whether constitutional, pursuant to federal and state law, and federal and state regulations, as well as Ethical and Professional Standards.

## V.   STATEMENT OF FACTS

**A.     ABOUT J.B.**

49.     J.B. was born on May 29, 2003.

50.     During the period that makes the basis of this complaint she was a student at Northampton Elementary and Hildebrandt Intermediate schools in the Klein Independent School District.

**B.     J.B. IS BULLIED AND HARASSED BECAUSE SHE IS FEMALE**

51.     While a student at KISD, J.B. was incessantly bullied and sexually harassed by male students. The bullying and sexual harassment began in 2011 when J.B. was in third grade and continued through 2017 at the end of her eighth-grade year. This six-year period of bullying and sexual harassment was perpetrated by a particular group of male students and chief among them were two boys named C.E. and Z.C.

52. In J.B.'s third grade year at Northampton Elementary School, C.E., Z.C., and other boys began repeatedly call her names like "fat", "short", "stupid", "ugly", "bitch", and "slut". On many occasions J.B. told her teacher Ms. Grant about the boys' behavior. Her teacher told J.B. that "it probably just means [they] like you" but that she "would look into it." However, the bullying and sexual harassment was not stopped.

53. In 2012, when J.B. was in fourth grade, the bullying and sexual harassment continued. It was at this time that she told her parents about these incidents and how C.E., Z.C., and other boys had been calling her names like "fat", "short", "stupid", "ugly", "bitch", and "slut" since the previous year.   J.B. also told them that C.E. had been telling her that the only reason T.J.B. (a male student) was friends with her was because they "were having sex," which was not true.

54. C.E. in particular became physically aggressive toward J.B., shoving her into things or pushing her down given the opportunity. In the winter of 2013, he slammed J.B.'s head against the gym wall.  J.B. went to the school nurse who called Ms. Beason at home to report the incident but to Plaintiffs' knowledge, the nurse did not report the incident to anyone else at KISD. On another occasion during the spring of 2013, C.E. pulled J.B. off the monkey bars by her leg while she was reading a book.

55. Ms. Beason spoke with J.B.'s fourth grade teacher Ms. Mickelson many times about the bullying sexual harassment in person, over the phone, and by email. On or about April 7, 2013, Ms. Beason received a phone call and an email from Ms. Mickelson stating:

   "Just left you a message on your phone. [J.B.] has had a very emotional day with lots of tears. I was hoping that you could speak with her. Mrs. Johnson [school counselor] is going to visit with her this afternoon. From what I can gather she is ***again*** [emphasis added] feeling like she is being bullied … Just wanted to give

you a heads up. I want nothing more than for my students to be happy at school and wish bullying never happened … I am trying to prevent this just not sure what else to do?"

56.   Ms. Beason also contacted the school's principal Ms. McKetta, who assured her the situation would be handled. Additionally, Ms. Beason spoke with the school counselor Ms. Johnson, who had previously been informed about the bullying and sexual harassment by J.B. and Ms. Mickelson. Ms. Beason implored Ms. Johnson to speak with C.E. to determine why he was acting so aggressively towards J.B. However, neither she nor Ms. McKetta investigated the reports pursuant to Title IX requirements or KISD policies and procedures. Not surprisingly, the bullying and sexual harassment continued.

57.   Ms. Beason began regularly eating lunch with J.B. at school. Some of J.B.'s friends told Ms. Beason about C.E., Z.C. and other boys calling J.B. names like "fat", "short", "stupid", "ugly", "bitch", and "slut". Ms. Beason walked over to C.E. to ask him to stop calling J.B. He responded by stating that he did not say that J.B. and Ms. Beason were those things but rather that *all* women were those things. It was obvious that C.E. in particular was specifically targeting females by bullying and sexually harassing them.

58.   At the end of J.B.'s fourth-grade year on June 6, 2013, a friend of Ms. Beason's named Marcey Greiner told her that she had witnessed C.E., Z.C., and other boys purposefully make J.B. cry by calling her names like "fat", "short", "stupid", "ugly", "bitch", and "slut". The group of boys had all given each other high-fives after succeeding. Afterwards Ms. Mickelson wrote Ms. Beason an email saying, "So sorry about what happened today at school."

59.   On the same day that incident occurred, Mr. Beason drove to the school and reported the

incident to the new school principal, Ms. Castillo, who promised him that KISD would keep J.B. safe. But to Plaintiffs' knowledge, she failed to conduct an investigation as required by Title IX and so the bullying and sexual harassment continued.

60.     Over time, J.B. began to change emotionally. During her fifth-grade year in the fall of 2013 she became very quiet and withdrawn. She did not want to go school and her grades dropped. J.B.'s parents told her fifth grade teacher Ms. Schweitzer about C.E., Z.C., and the other boys who continued to bully and sexually harass their daughter.

61.     On April 23, 2014, Ms. Beason sent Ms. Schweitzer an email detailing how, on the previous day, C.E. had kicked J.B.   Ms. Schweitzer wrote back saying:

> "[J.B.] was strong today and I let her know that I will be by her side whenever she needs help. I have also been monitoring her on the playground, informed the P.E. teachers and walked her out first for dismissal today. I told her to let me know if she needs anything-I am always there for her."

62.     Ms. Schweitzer attempted to keep C.E. away from J.B., but C.E. would see J.B. at recess, after school, and at lunch, and he would not miss an opportunity to bully and harass her. Ms. Schweitzer told Ms. Beason that she had brought up the problem with administrators on multiple occasions but to Plaintiffs' knowledge, an investigation was never conducted as required and the bullying and sexual harassment continued.

63.     During the spring of 2014, C.E. pushed J.B. to the ground from behind after school, causing her to cry and bleed.   J.B.'s father immediately reported the incident to Principal Castillo who assured the family the problem would be stopped. However, Ms. Beason called the school the next day and was told by Ms. Castillo that there was nothing more the school could do about the bullying and sexual harassment. The principal suggested Ms. Beason contact the KISD police department, which she did. Neither KISD nor the

KISD police department would provide information to J.B.'s parents about any action taken by KISD police over the situation.

64. By this time, many of J.B.'s peers would not interact with her for fear of becoming targets of the bullies as well. School administrators had failed to do anything about J.B.'s treatment and as a result, C.E., Z.C., and other boys continued to bully and sexually harass her with increasing intensity and without fear of punishment.

65. In the summer of 2014, before J.B. began sixth grade at Hildebrandt Intermediate School in KISD, Ms. Beason met with the school counselor Marcy Wilson to discuss how J.B. had been the target of bullying and sexual harassment over the three previous years.   Ms. Beason wanted to make sure that C.E. would not be in any of J.B.'s classes due to the bullying and sexual harassment.   Ms. Wilson, who shared the fact that she was already planning to speak with C.E.'s parents on another matter, informed Ms. Beason that, only by happenstance, C.E. had not been assigned to be in any of J.B.'s classes. Again, Ms. Beason was promised that J.B. would be kept safe but to Plaintiffs' knowledge, nothing was done to address the bullying and sexual harassment.

66. In sixth grade C.E., Z.C., and other boys continued to call J.B. names such as "freak" and "fat" and "ugly" and "bitch" and "slut". In the middle of the year, C.E. pushed J.B. down the stairs while she was on her way to class. Ms. Beason called the school the following day about the incident and spoke to Assistant Principal Shallenberger. Still, nothing was done about the bullying and sexual harassment.

67. By this time the perpetrators had stopped using J.B.'s actual name and instead referred to her solely using derogatory terms such as "slut". C.E. would also frequently grab his

crotch and tell J.B. to "suck this freak." Ms. Beason reported C.E.'s ill treatment of J.B. to Assistant Principal Barton, who told her that the situation would be handled. But to Plaintiffs' knowledge, no investigation was conducted as district policy and Title IX require and thus the bullying and sexual harassment was allowed to continue.

68.     Over the next three years of her sixth, seventh, and eighth grades, whenever J.B. was in earshot at lunch in the cafeteria, C.E., Z.C., and their friends would make vulgar comments to her such as "nice butt" and "nice tits" and "wanna have sex?"

69.     J.B. frequently reported these comments to the teachers and administrators on lunch monitor duty only to be told to "sit down" and "ignore the boys" and their comments. Upon information and belief, not one of these teachers or administrators on lunch monitor duty who received J.B.'s complaints ever reported the incidents to anyone else at KISD, no investigation was conducted, and no action was taken to stop the bullying and sexual harassment. Eventually J.B. stopped reporting these incidents to the monitors because nothing was ever done.

70.     During one such lunch period in November 2015 in her seventh-grade year, C.E. and Z.C. were calling J.B. names like "freak" and "fat" and "ugly" and "bitch" and "slut" as well as making sexually lude comments.  J.B. became so upset that she loudly screamed at them to leave her alone.  One of the lunch monitors sent J.B., C.E., and Z.C. to Assistant Principal Marti's office.   Ms. Marti called Ms. Beason and told her that J.B. screamed at lunch. After getting additional details about the incident from her daughter, Ms. Beason called Ms. Marti to tell her that J.B. had screamed because the two boys would not stop harassing her. However, no investigation was conducted as required and

nothing was done stop the bullying and sexual harassment.

71. C.E., Z.C., and other boys especially targeted J.B. with sexual harassment when she was walking in the school hallways.   She reported the boys' behavior to Ms. Shallenberger, who suggested J.B use headphones when walking in the hallway so she wouldn't hear what they were saying to her. The following day Ms. Beason talked to Ms. Shallenberger on the phone and was given the same suggestion of headphones for her daughter. Despite receiving these disturbing reports, there was no investigation conducted by district staff as required and the bullying and sexual harassment continued.

72. Furthermore, in December 2015 during her seventh-grade year, C.E. told J.B. during lunch that her dad left her mother because J.B. was so ugly and called her names such as "freak" and "fat" and "ugly" and "bitch" and "slut".   In response, J.B. threw a napkin at the boy, and was sent to Ms. Marti's office.   She was punished by making her sit in a different area at lunch for over a week.   None of the other students wanted to sit with J.B. due to fear of becoming targets and because she was emotionally fragile due to the bullying and sexual harassment. In spite of the fact that J.B. specifically told Ms. Marti what led her to throw the napkin at C.E., she did not open an investigation as required and the bullying and sexual harassment continued.

73. At the end of seventh grade in 2016, J.B. tried out for the cheerleading squad and made the team. During the annual seventh grade teacher/student basketball game, Ms. Beason alerted cheerleading sponsors Maggie Ritz and Tina James, who were also eighth-grade teachers, about the bullying and sexual harassment and its principal perpetrator C.E.   To Plaintiffs' knowledge, Ms. Ritz and Ms. James did not report this to KISD staff or take

any other action.

74.    During J.B.'s eighth-grade year, as they had in previous years, C.E., Z.C., and other boys continued to call J.B. names like "freak" and "fat" and "ugly" and "bitch" and "slut".   By this time, J.B. was having severe physical and mental symptoms associated with anxiety caused by the bullying and sexual harassment. She was increasingly separating and isolating herself from her peers. J.B. started becoming ill quite often—first, she contracted strep throat, then influenza, and then she began having stomach pains.

75.    On or about September 28, 2016, Ms. Beason had a meeting with the cheer sponsors, Ms. James and Ms. Ritz, as well as Ms. Shallenberger. The meeting was in regard to "cheer demerits" J.B. had received due to absences. During the meeting, the cheer sponsors discussed their concern that "J.B. was having a hard time socializing with the other girls." Ms. Beason informed them again about the bullying and sexual harassment J.B. had been enduring and that it had made her closed off. She specifically singled out C.E. as the main perpetrator, pausing to make sure the group understood she was not talking about Ms. Ritz's son who shares the same first name. "Yeah, we know about him," one of them responded. Yet they failed to do anything about the bullying and sexual harassment to help J.B.   At that point Ms. Beason decided to take her daughter out of cheer.

76.    On or around December 5, 2016, J.B. was walking when C.E. pulled her hair very hard from behind.   She went to the office and reported the incident directly to Ms. Marti.   Ms. Beason also spoke with Ms. Marti the next day who said there had been "no report of bullying".   Mother followed up by sending an email to Ms. Marti saying J.B. was hurt that the bullying was denied after she had personally discussed it with the principal. Still,

to Plaintiffs' knowledge, she did nothing and the bullying and sexual harassment was allowed to continue.

77.     In February 2017, C.E. made comments to J.B. about her breast size and touched her on her buttocks from behind in the hallway.   J.B. immediately told a teacher that was nearby but the teacher responded by suggesting that she ignore him.

78.     As a result of the extensive bullying and harassment J.B. suffered while at KISD, she developed an anxiety disorder, depression, and insomnia. She also began to suffer from irritable bowel syndrome (IBS) and due to severe stomach pain, was taken to the emergency room at least four times in her eighth-grade year. Additionally, J.B. was prescribed medication for the anxiety and depression and started regularly seeing a talk therapist and a physician for her gastrointestinal issues.

79.     Due to the ongoing bullying and sexual harassment and the district's failure to take any actions to stop it pursuant to Title IX as well as their own policies and procedures, it was determined that in the best interest of J.B.'s physical and mental health, she should not return to the Hildebrandt Intermediate environment. Her last day of attending the school in person was February 26, 2017.

80.     Around March of 2017, Ms. Beason received a message left by a worker with the Department of Family and Protective Services (CPS) who was investigating a complaint made against her regarding her child being frequently absent from school. Thinking it was about her son (who was on homebound services due to a seizure disorder), Ms. Beason made an appointment with the Klein Oak High School counselor, Mary-Margaret Bollato.

*First Original Complaint*                                                                                          24

81.    When they met, Ms. Bollato told her that no one at the high school had contacted CPS. Ms. Beason then told the counselor about J.B. and the bullying and sexual harassment her daughter had experienced at the hands of C.E.   Ms. Bollato told her that it would be hard to keep C.E. away from J.B., even if Ms. Beason procured a restraining order, and that someone with J.B.'s issues should go to school somewhere else.   Ms. Bollato then gave her a list of different schools of mixed type (charter/private/online schools).

82.    On or around March 22, 2017, Ms. Beason handed Hildebrandt Intermediate staff a letter detailing the recommendation of J.B.'s physician and therapist that J.B. be placed on "homebound status" due to anxiety and fear relating to the school environment.

83.    On or around March 31, 2017, Ms. Beason sent an email to school counselor Kathryn Bitter regarding an upcoming meeting to determine whether or not J.B. would be approved for homebound services. She reiterated the need for the services due to her daughter's severe anxiety caused by the years of bullying by her peers. To Plaintiff's knowledge, the allegations of bullying were not investigated as required.

84.    On or around April 6, 2017, the meeting was held to discuss the family's request for homebound services. Some of those in attendance were Ms. Beason, Assistant Principal Tommy Newton, and Ms. Bitter.   J.B.'s mother revisited the medical professionals' opinions and recommendation that her daughter be placed on homebound status. Mr. Newton told those in attendance that there was "no record of bullying."   Ms. Beason replied that for years, "C.E. has harassed and tortured J.B." Mr. Newton rudely scoffed, "Tortured? Come on!"   The family's request for homebound services was subsequently denied.

85.     The next day Ms. Beason sent an email to Ms. Marti, Klein ISD 504 Coordinator Dr. Mary Rosenberg, and Mr. Ron Webster, the Executive Director of the Department of Campus Safety & Support. In her email she went over the events of the previous day's meeting, reviewed the manifestation of physical and mental disorders because of the bullying and sexual harassment of her daughter, and restated the request for homebound services. To Plaintiff's knowledge, the allegations of bullying and sexual harassment were not investigated as required.

86.     On or around April 11, 2017, Ms. Beason sent another email to Ms. Marti and Mr. Webster inquiring about getting a restraining order for J.B. against C.E. due to the bullying and harassment. To Plaintiff's knowledge, no KISD administrator investigated these allegations of bullying as required.

87.     On or around April 13, 2017, Ms. Beason sent an email to Ms. Marti after the principal spoke directly with J.B.'s therapist, who had informed the administrator that J.B. should not return to the school over concerns for her health and safety.   On or around April 17, 2018, Ms. Marti replied to Ms. Beason's email to say that she did speak with the therapist about the bullying and health concerns but that KISD was still denying the family's request for homebound services. To Plaintiff's knowledge, Ms. Marti did not investigate these allegations of bullying as required.

88.     On the same day, Ms. Beason emailed a letter from J.B.'s therapist to Ms. Marti, Assistant Principal Kimberley Williams, and KISD Health Services Coordinator Laurie Combe detailing J.B.'s treatment for "significant anxiety" with goals to:

> "…[develop] coping strategies to deal with…an extensive history of severe bullying and peer rejection experiences, dating from elementary school to her

most recent school involvement. The goal for [J.B.] is to increase her ability to cope with feelings of anxiety and fear relating to a school environment, and to enter High School as planned in Fall 2017."

To Plaintiff's knowledge, no KISD administrator investigated these allegations of bullying as required.

89.     On or around April 18, 2017, Ms. Beason received an email from Mr. Webster informing her that her second request for homebound services was denied. He acknowledged her concerns about J.B. being bullied but to Plaintiff's knowledge, the allegations of bullying and sexual harassment were not investigated as required.

90.     On or around May 2, 2017, Ms. Beason sent an email to Ms. Marti, Mr. Webster, and Dr. Brian Champion, Klein ISD Superintendent. In it she restated the need for homebound services due to her daughter's severe anxiety caused by the years of bullying by C.E. and other students. Ms. Beason requested any formal investigation paperwork that had been conducted regarding J.B.'s and the parents' numerous complaints to KISD staff of bullying and sexual harassment as well as the family's intent to file a level one grievance per the school's FNG (LOCAL) policy, *Student Rights and Responsibilities: Student and Parent Complaints/Grievances.* To Plaintiff's knowledge, the allegations of bullying and sexual harassment were still not investigated as required by Title IX standards and the school's own policies and procedures.

91.     In May 2017, the district finally granted the family's request for homebound services with the caveat that, despite the fact that J.B. had attended school for approximately half the school year before being unable to attend due to the bullying and sexual harassment, she would not receive any credits for her eighth-grade year and would be required to

repeat. J.B.'s parents subsequently withdrew her from the district.

**C.    THE SCHOOL DISTRICT WAS ON NOTICE THAT J.B. WAS THE VICTIM OF BULLYING AND SEXUAL HARASSMENT**

92.    During her third-grade year from 2011-12, J.B. reported that she was being bullied and harassed to her teacher Ms. Grant.

93.    In 2012-13, when J.B. was in the fourth grade, either J.B. and/or her parents reported the bullying and sexual harassment numerous times to Klein ISD teachers and administrators including, but not limited to, Ms. Castillo, Ms. McKetta, Ms. Mickelson, and Ms. Johnson.

94.    In fifth grade in 2013-14, either J.B. and/or her parents reported the bullying and sexual harassment numerous times to Klein ISD teachers and administrators including, but not limited to, Ms. Castillo, Ms. Johnson, and Ms. Schweitzer as well as the Klein ISD Police Department.

95.    During the time she was a student at Hildebrandt Intermediate from 2014-17, either J.B. and/or her parents reported the bullying and sexual harassment numerous times to Klein ISD teachers and administrators including, but not limited to, Ms. Wilson, Mr. Barton, Ms. Marti, Ms. Schallenberger, Ms. Williams, Ms. Ritz, Ms. James, Ms. Bollato, Ms. Bitter, Mr. Newton, Ms. Combe, Dr. Rosenberg, and Dr. Champion.

96.    During a meeting of the Klein ISD School Board in 2015, Kristi Turnbell – mother of another female KISD student, spoke before the board about how female students were being treated differently than male students in the district. She related her belief that girls received disparate punishments relating to boys, who were essentially permitted by KISD staff to behave however they wanted.

97.     Despite receiving these reports, KISD teachers, administrators, and KISD school board members did not investigate their allegations or take any other action to stop J.B. from being bullied and sexual harassed pursuant to Title IX standards, the Department of Education/OCR recommendations, state law, or TASB guidance, not to mention the district's own policies and procedures.   The bullying and sexual harassment maintained by C.E., Z.C., and other boys was simply permitted to fester, all to J.B.'s detriment.

**D.      J.B.'S RIGHTS WERE VIOLATED BY KLEIN ISD**

98.     As a female student, J.B. has a right to be educated in a non-hostile educational environment pursuant to Title IX. Those rights are further protected by directives from the United States Department of Education, *Office of Civil Rights.* Moreover, and most importantly, KISD has also developed policies and procedures to protect a female student--like J.B.--from such bullying and sexual harassment based upon sex or gender. Those policies gave her and her parents a number of substantive rights.

99.     Such rights include but are not limited to, first and foremost, the right to receive notice of their procedural rights under Title IX, which were never provided.

100.    Nor did Plaintiffs ever receive notice of who the Title IX for KISD, in regard to investigating allegations of the bullying and sexual harassment of a student who belongs to a protected class.

101.    KISD never provided information about Plaintiffs' right to file a formal grievance with the School District.

102.    KISD never provided the family information about their right to file a formal complaint with the Office of Civil Rights.

*First Original Complaint*                                                                                              29

103.   KISD did not even follow their own policies and procedures requiring allegations of bullying be investigated by the appropriate staff member.

104.   KISD failed to timely investigate the allegations of bullying and sexual harassment as contemplated by Title IX jurisdiction and KISD's own policies.

105.   KISD never provided a psychological assessment.

106.   KISD never provided school-based counseling services.

107.   KISD never provided an aide or shadow to observe J.B. at the school.

108.   KISD never provided J.B. a class or program on social skills so she would know how to deal with the bullying.

109.   KISD was clearly indifferent to the rights of J.B. to be educated in a safe and non-hostile educational environment.

110.   KISD also failed to provide J.B. any services to address the effects of the bullying and sexual harassment she experienced, and were indifferent to her rights, thereby.

## VI.   CLAIMS FOR RELIEF PURSUANT TO TITLE IX

111.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

112.   Title IX specifically notes the standards of liability for a public entity in regard to the Title IX claim. The claimant must be a member of a protected class; must be bullied, harassed or assaulted based upon membership in that class; the Defendant entity must be on notice as to the allegations; be deliberately indifferent to those allegations and the victim must have experienced a deprivation of educational opportunities and/or other damages. J.B. easily satisfies all those threshold requirements.

*First Original Complaint*                                                                 30

113.    Plaintiffs further contend that these failures of the Defendant School District to have effective policies, procedures, practices and customs in place to assure J.B. was not a victim of bullying, harassment, or assault based upon gender, or based upon stereotypes based upon gender, and due to such failures violated her rights pursuant to Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. §1681 et seq., upon which she now seeks recovery.

114.    Last, J.B. has a private cause of action against the School District for their violation of the rules and regulations promulgated pursuant to Title IX.

## VII.    RATIFICATION AND RESPONDEAT SUPERIOR

115.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

116.    KISD ratified the acts, omissions, and customs of school district personnel and staff.

117.    As a result, KISD is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of J.B. under the theory of Respondeat Superior.

## VIII.    PROXIMATE CAUSE

118.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

119.    Each and every, all and singular of the foregoing acts and omissions, on the part of KISD, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## IX.    SPOLIATION

120.    Plaintiffs hereby require and demand that KISD preserve and maintain all evidence

pertaining to any claim or defense related to the assault or other violations made the bases of this Complaint and request for due process or the damages resulting therefrom, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence regarding the assault or other violations set forth herein.

121.    Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation interference rule—an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

## X.   DAMAGES

122.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

123.    As a direct and proximate result of KISD's conduct, J.B. suffered injuries and damages, for which she is entitled to recover herein including but not limited to:

a.       Loss of equal educational opportunities in the past;

b.       Loss of equal educational opportunities in the future; and

c.       Various out-of-pocket expenses incurred due to the acts and omissions of KISD.

## XI.   JURY DEMAND

124.    Plaintiffs request a trial by jury.

## XII.   PRAYER

125.    Plaintiffs pray for judgment against KISD in the manner and particulars noted above, and

in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorneys' fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to Title IX and 42 U.S.C. §2000d et seq., together with pre- and post-judgment interest, and court costs expended herein, as well as the equitable issues noted above; and for such other relief as this Court in equity, deems just and proper and for such other relief as the Court may deem just and proper in law or in equity.

Respectfully submitted,

*/s/ Martin J. Cirkiel*
Martin J. Cirkiel, Esq.
State Bar No.: 00783829
Federal ID No. 21488
marty@cirkielaw.com

Holly Terrell, Esq., Of Counsel
State Bar No. 24050691
Federal ID No. 1034278
holly@cirkielaw.com

Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

**ATTORNEYS FOR PLAINTIFF**